# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of: | ) | |
| **Electronics Seized on November 15, 2021 in ATF case number 772120-22-0011** | ) ) ) ) ) | Case No. 21 - m - 750 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Electronics Seized on November 15, 2021 in ATF case number 772120-22-0011, further described in Attachment A, incorporated herein.

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B, also incorporated herein.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: which constitutes evidence of Title 18, United States Code, Sections 922(g)(1), 922(p), 922(a)(1)(A), and Title 26, United States Code, Sections 5861(a), (b), and (f).

The application is based on these facts: See attached Affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

RYAN ARNOLD        Digitally signed by RYAN ARNOLD
                   Date: 2021.12.08 13:20:38 -06'00'

_____
*Applicant's signature*

_____Special Agent Ryan Arnold_____
*Printed Name and Title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim P. 4.1 by
<u>TELEPHONE</u> (specify reliable electronic means):

Date: __12/8/2021__

_____
*Judge's signature*

City and State: <u>Green Bay, Wisconsin</u>

_____JAMES R. SICKEL, U.S. Magistrate Judge_____
*Printed Name and Title*

# AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Special Agent Ryan Arnold, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices and supplemental examinations of electronically stored information previously extracted from electronic devices—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. The Bureau of Alcohol, Tobacco, Firearms and Explosives (Milwaukee Field Office) has in their lawful possession a cell phone, multiple USB drives, and multiple SD cards, lastly four phone SIM cards (all further described in Attachments A), for electronically stored information related to an ongoing investigation into Mitchell GUERRERO (DOB: 1992) for evidence of violations of 18 U.S.C. § 922(g)(1) (felon in possession of ammunition), 18 U.S.C. § 922(p) (illegal for person to possess, sell, manufacture, ship, import, a plastic firearm), 18 U.S.C. § 922(a)(1)(a) (engaged in the business without a license), 26 U.S.C. § 5861(b) (Receive/Possess NFA Firearm in violation of law), 26 U.S.C. § 5861(a) (engage in NFA make/Import/Deal business without a license), and 26 U.S.C. § 5861(f) (Make NFA weapon in violation of law).

3. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") assigned to the Milwaukee Field Office since April 2015. With the

ATF, I have participated in numerous investigations into firearms trafficking, unlawful possession of firearms by prohibited persons, unlawful use of firearms, drug trafficking, and arson. I have previously investigated firearms trafficking organizations that purchase, transport, and traffic firearms both nationally and internationally.

4.      Prior to my employment with ATF, I was a Special Agent with the United States Secret Service (USSS) for approximately 5 years. My duties included providing and planning dignitary protection, drafting and executing federal search warrants, and investigating organized fraud networks, counterfeit currency, and other financial crimes.

5.      I have participated in numerous firearms trafficking and drug trafficking investigations involving the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. I have regularly used electronic evidence, including information about historical and prospective wireless communications, to find proof relating to the commission of criminal offenses, including the manner, means, and identity of co-conspirators.

6.      Based on my training, experience and participation in drug trafficking and firearms trafficking investigations, I know and have observed the following:

7.      I have relied on informants to investigate firearms trafficking and drug

2

trafficking. Through informant interviews and debriefings of individuals involved in those offenses, I have learned about the manner in which individuals and organizations finance, purchase, transport, and distribute firearms and narcotics both within and outside of Wisconsin. I have utilized informants to conduct "controlled purchases" of firearms and controlled substances from individuals, as opposed to licensed gun dealers. I have also conducted surveillance of individuals engaged in firearms and drug trafficking and participated in the execution of numerous search warrants resulting in the seizure of drugs, firearms, ammunition, and magazines.

8.     Based on my training and experience, I have become familiar with the language utilized over the telephone to discuss firearms and drug trafficking and know that the language is often limited, guarded, and coded. I also know that firearms and drug traffickers often use electronic devices (such as computers and cellular phones) and social media to facilitate these crimes, including to communicate and navigate.

9.     I know that firearms traffickers and drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate these and related offenses. I also know that firearm and drug traffickers often use proceeds to purchase assets such as vehicles, property, jewelry, and narcotics. I also know that firearm and drug traffickers often use nominees to purchase or title these assets to avoid scrutiny from law enforcement.

10.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the

requested warrants and does not set forth all of my knowledge about this matter.

11.     There is probable cause to believe that evidence of violations of the following laws of the United States, including the things described in Attachment B, will be found in the records, information, and property listed in Attachment A: 18 U.S.C. § 922(g)(1) (felon in possession of ammunition), 18 U.S.C. § 922(p) (illegal for person to possess, sell, manufacture, ship, import, a plastic firearm), 18 U.S.C. § 922(a)(1)(a) (engaged in the business without a license), 26 U.S.C. § 5861(b) (Receive/Possess NFA Firearm in violation of law), 26 U.S.C. § 5861(a) (engage in NFA make/Import/Deal business without a license), and 26 U.S.C. § 5861(f) (Make NFA weapon in violation of law). There is also probable cause to believe that the information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

12.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, see 18 U.S.C. § 2711(3)(A)(i).

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

13.     The property to be searched are the following, all items are in a secured vault at the ATF Milwaukee Field Office located at 1000 N. Water St, Suite 1400, Milwaukee, WI, 53202:

A. Eleven (11) various in size USB Thumb Drives located near the basement printers listed under ATF case number 772120-22-0011

4

item 000008

B. Five (5) Micro-SD cards of various size listed under ATF case number 772120-22-0011 item 000009

C. One (1) Verizon, One (1) Cricket, and two (2) Sprint Sim Cards for cell phones listed under ATF Case number 772120-22-0011 item 000010

D. One (1) PNY 16GB Micro-SD card located inside 3d Printer listed under ATF case number 772120-22-0011 item 000011

E. One (1) LG Smartphone model #LM-Q730TM bearing IMEI#354590114484068 listed under ATF case number 772120-22-0011 item 000012

## PROBABLE CAUSE

14. You affiant has been working in conjunction with the Brown County Drug Task Force concerning a Mitchell GUERRERO. Your affiant has been in communication with Brown County Drug Task Force Investigator Brendan Pizzala. In October, Investigator Pizzala contacted your affiant and informed him of suspected firearms manufacturing being completed by previous convicted felon Mitchell GUERRERO. Your affiant is aware GUERRERO is a previous convicted felon for the following state of Wisconsin court cases; 2009CF001490 (Deliver cocaine, posses w/intent cocaine, possession of THC; 2010CF000374 (Bail Jumping); 2014CF001027 (Possession of THC 2nd offense); 2018CM001076 (Disorderly conduct modifier domestic abuse).

15. On August 31st, 2021 at approximately 2:00PM, Narcotics Investigator Zeise

5

conducted a traffic stop on a red, 2015 Chevrolet Cruze bearing Wisconsin license plate ALY6791. This vehicle was registered to DANIEL J. HEINZ (07/08/1988) at 4426 Shawano Avenue in the Village of Howard, Brown County Wisconsin. The traffic stop was conducted in part of a traffic violation at the intersection of 12th Avenue, and Clinton Street and HEINZ being known to law enforcement as a methamphetamine source of supply in Brown County. During the traffic stop at the Marathon Gas Station, 952 W. Mason Street, Narcotics Investigator Mason utilized his single purpose narcotics K9 Sasha to sniff the exterior of the vehicle. N/I Mason informed officers based on his observations of K9 Sasha during the sniff of the vehicle, officers could search the vehicle. During the search of the vehicle your affiant, Narcotics Investigator Pizzala acted as evidence custodian. Investigators located the following inside of ALY6791, 580.79 grams of methamphetamine, 208.85 grams of marijuana, drug paraphernalia, one handgun (black in color with no identifying numbers), $11,403.00, a black Iphone (entered into Brown County Drug Task Force evidence as 21-218-001, exhibit 2). Investigator Pizzala had tested the clear crystalline rock like substance located within the vehicle using the TruNarc device. The clear crystalline rock like substance tested positive for the presence of methamphetamine. Investigator Pizzala tested the green plant like material using the Duquenois Levine Reagent Test, my observations indicated a positive test for marijuana, which contains THC, a controlled substance. Based on Investigator Pizzala's training and experience, HEINZ possessed the methamphetamine and marijuana with the intent to deliver. The large quantity of methamphetamine which was packaged into numerous baggies, extra packaging supplies, digital scales indicated to Investigator Pizzala that

6

HEINZ was distributing methamphetamine and marijuana in Brown County. The presence of large sum of US currency is consistent with distribution. Drug traffickers accrue large sums of currency from drug trafficking. USC to be comprised primarily of $20 bills, which is consistent with that of monies obtained through drug distribution. Your affiant know persons who obtain money from the distribution of illegal controlled substances often have currency in such denominations due to the pricing of drugs, the ease with which such denominations can be used to complete drug transactions, and the prevalence of drug users to possess smaller denominations. During a custodial interview that N/I Linsmeyer conducted with HEINZ, HEINZ admitted to selling methamphetamine to 10-15 customers, where HEINZ sells a gram of methamphetamine for $50, 3.5 grams for $100.00, and ounces of methamphetamine for $500-$600.00. During that interview HEINZ admitted to purchasing a pound of methamphetamine for $6000.00 from a person in Milwaukee, Wisconsin approximately 3-4 days prior to HEINZ arrest. HEINZ denied consent for investigators to search his black Iphone, exhibit 2. HEINZ was transported to the Brown County Jail where he was turned over to jail staff.

16. On October 18th, 2021, N/I Mason and Investigator Pizzala interviewed DANIEL J. HEINZ (DOB: 07/08/1988) with his attorney L. Schuchart present at the Brown County Jail. During that interview HEINZ provided information concerning a drug trafficking organization which had been conspiring to distribute illegal controlled substances from approximately March of 2021 through September 2021. HEINZ outlined that methamphetamine (meth) was the main drug being distributed, but explained the DTO also distributed a little of everything. The following information was provided by

7

HEINZ and occurred during the aforementioned time frame (March-September of 2021) unless otherwise specified. HEINZ explained that he had been released form prison in January of 2021 and remained sober from drugs until approximately March of 2021 when he ran into an ex-girlfriend who he obtained methamphetamine. HEINZ explained that by April 2021 he was dealing ounces of methamphetamine, which eventually grew into 4-5 pounds of methamphetamine every 4-6 days. HEINZ explained that he had approximately 20-30 customers and he had distributed approximately 40-50 pounds of methamphetamine during March 2021- September 2021. HEINZ stated that he paid between 4-6 thousand dollars for a pound of methamphetamine and named a few sources of supply for his methamphetamine operation. HEINZ stated that although he sold mostly methamphetamine, he has also sold approximately 5-10 pounds of marijuana, 2-3 ounces of cocaine, and 7 grams of heroin. HEINZ explained that his 20-30 customers all had customers of their own but kept their customers to themselves so he would not have any knowledge of his "customer's" customers. HEINZ stated that he sold methamphetamine to a male he knew as MITCHELL. HEINZ stated that MITCHELL lives on Bader Street in the City of Green Bay. I showed HEINZ an unlabeled colored photograph which HEINZ stated was MITCHELL. That photograph was of MITCHELL J. GUERRERO (DOB: 11/26/1992). HEINZ stated that he sold approximately 3 ounces of methamphetamine to MITCHELL and obtained the gun from MITCHELL. HEINZ stated that the handgun investigators seized during the traffic stop was the handgun (privately made firearm with no identifying markings) HEINZ purchased from MITCHELL. HEINZ stated that MITCHELL was making "ghost guns" in the basement of 834 Bader

8

Street. HEINZ stated that MITCHELL was using a computer to 3D print the handguns. HEINZ stated that he traded an ounce of methamphetamine for the handgun. HEINZ stated that he asked MITCHELL if the guns worked or functioned, to which HEINZ stated that MITCHELL said they did. HEINZ stated that he knows that MITCHELL made 4 guns using the 3D printer. HEINZ stated that MITCHELL obtained a 3d print for "Glock" and from HEINZ knowledge MITCHELL was working on building a 3d print Glock. HEINZ stated he did not know much about guns.

17.    On November 15th, 2021 Investigators from the Brown County Drug Task Force established surveillance on 834 Bader Street due to the ongoing drug conspiracy case involving HEINZ and co-conspirators. At approximately 3:45PM, Investigator Pizzala observed GUERRERO exit the residence with a child and enter 928-YFW. N/I Mason and Waeghe conducted a traffic stop on 928YFW, a black Buick Lacrosse sedan registered to GUERRERO at 834 Bader Street. N/I Mason and Waeghe stopped the vehicle on Lime kiln Road near E. Mason Street. GUERRERO was asked to exit the vehicle, when N/I Mason performed a pat down search of GUERRERO. N/I Mason observed a switch blade knife tucked into the rear of GUERRERO waste band. The knife was removed from GUERRERO and GUERRERO was placed into handcuffs. N/I Mason searched GUERRERO's wallet which contained a handwritten note stating "3D Print for Juanita,

1. Toothbrush holder 4ct.

2. Glove box holder for baby wipes 3 ct.

3. Necklace hanger

N/I Mason also located a gem baggie with blue imprints that contained .58 grams of

9

powder. N/I Mason informed me that the powder tested positive for the presence of methamphetamine using the Marquis Reagent and methamphetamine test kits. Also located was a cut straw with residue inside. Based on the investigators on scene's training and experience I know that the straw is commonly used to snort powder substance or used a scoop to move powder from bulk supply to a smokable amount. N/I Mason also observed a metal router in the vehicle. Based on this information Investigators believed that GUERRERO was still in possession of a 3d printer and due to the totality of the items located GUERRERO was still manufacturing 3d firearms. GUERRERO did not want to speak with investigators and was transported to the Brown County Jail, where he was turned over to jail staff. Recovered from GUERRERO's person was Device E as described in Attachment A.

18. Based on my training and experience I know that GUERRERO is a felon and cannot possess firearms. Based on the interview conducted with HEINZ the firearm located during the traffic stop was purchased from GUERRERO. Based on my training and experience I know that "privately made firearms" (PMF) is a firearm including a frame or receiver, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number or other identifying marking placed by a licensed manufacturer at the time the firearm was produced. A 3D printed firearm is a firearm that is primarily produced with a 3D printer. They can be classified by the types of printers used, plastic, metal or both. 3D printed firearms are practical when the frame is printed in plastic and the use of a metal action and barrel that was purchased in a kit is used, although fully plastic firearms could be made. Firearms that are entirely made from plastic that cannot be detected

by a metal detector are prohibited by federal law.

19.    Shortly after the traffic stop of GUERRERO, Investigator Pizzala applied for and obtained a state search warrant at the residence of GUERRERO identified as 834 Bader St, Green Bay, WI, 54302.

20.    That evening, members of the Brown County Drug Task Force executed a residential state search warrant at 834 Bader St, Green Bay, WI, 54302. In the basement of the residence, investigators located three 3D printers to include material to operate the devices. Additionally, law enforcement recovered multiple 3D printed frames/receivers/slides for firearms to include additional firearm parts.

21.    Additionally recovered from the residence were two (2) suspected Silencers, which to possess lawfully the individual must apply for and receive the proper tax stamp. After a check of the NFA database, your affiant confirmed GUERRERO has no lawfully registered NFA firearms in his name.

22.    Investigators also recovered hundreds of rounds of ammunition. To be specific, agents are aware of twenty-seven (27) unfired cartridges of .22 caliber Aguila ammunition and fifteen (15) unfired cartridges of 9mm Remington ammunition recovered from firearms in the basement. Both sets of ammunition traveled in interstate commerce and due to GUERRERO's felony convictions he cannot possess the ammunition lawfully.

23.    Investigators recovered a complete plastic, white in color, AR-15 Auto-Sear (swift link). This device takes a semi-automatic AR-15 and converts the firearm to fully automatic. With this device in place, a user of the weapon can manipulate the trigger with

11

one pull and the firearm will discharge multiple rounds of ammunition thus making it a fully automatic machine gun and subject to NFA regulations and violations. These devices in themselves are classified as Machine Guns and are illegal to possess without the proper tax stamp. It appeared this device was made by a 3D printer which is becoming a common occurrence across the United States.

24.     Investigators recovered a completely manufactured suspected plastic .22 caliber firearm. The firearm was green and white in color and appeared to be made of complete plastic. Agents where aware plans for this firearm can be found on dark web but had not observed one in person until this date. If the firearm can pass through a metal detector and is undetectable it is unlawful to possess.

25.     Lastly, investigators recovered ATF Items 000008, 000009, 000010, and 000011 as fully described in attachment A. These items were recovered from the basement of 834 Bader St, Green Bay, WI. Your affiant is aware 3D printed firearm blueprints are commonly located on USB and Micro SD cards. The items can be purchased and plugged directly into the printer to then manufacture the devices. Your affiant is seeking a warrant to search these devices for various plans of firearms and NFA weapons (machine gun kits, sears, etc.).

26.     Your affiant is aware that night Janet Guerrero (GUERRERO's mother) made a mirandized statement to investigators. Janet Guerrero advised her son (Mitchell GUERRERO) hangs out in the basement with his friends and brother Joe Molitoris. Janet Guerrero stated the 3D printers in the basement were Mitchell GUERRERO's. Additionally, Janet Guerrero stated her son (Mitchell GUERRERO) also had property in

the upstairs bedroom.

27.     On November 18, 2021, ATF brought in two subject matter experts on 3D printed firearms and NFA weapons to the Brown County Drug Task Force. The two individuals are assigned to ATF's Firearms, Ammunition, and Technology Division. Both individuals examined all the evidence obtained from 834 Bader St, on 11/15/21. Both concluded the individual operating the machinery in the basement possessed a high level of skill in manufacturing firearms. Additionally, both concluded they could provide a verbal nexus that the silencers recovered from the basement and the white AR-15 Auto sear did qualify as machine guns and were subject to NFA weapons violations.

28.     Based upon my training, experience, and the investigation to date, I submit that there is probable cause to believe that there is additional evidence of crimes in the electronic media devices recovered from GUERRERO's basement along with his cell phone. Your affiant is aware individuals use different means of communication, including Instagram messenger, text messages, Facebook messages, and Snapchat to obtain, transfer, and communicate about the use and possession of firearms, including converting firearms from semi-automatic to fully-automatic machineguns. Instagram and Facebook are commonly used on cellular devices, such as the targets of this warrant.

29.     I am also aware that firearms users and traffickers commonly take photographs of firearms for purposes of distribution. Given the scope of GUERRERO's involvement in firearms, it is probable to believe that photographs of firearms will be located on his electronic devices, which is relevant in tying GUERRERO to the firearms.

30.     I am further aware that firearms traffickers commonly communicate with

13

individuals via text message or other social media platforms to negotiate and plan the distribution of their firearms.

31.     Because there is probable cause to search GUERRERO's cell phones for evidence of a crime, it is necessary to conduct a full forensic search of the phone to prove ownership and control.  I am aware that individuals commonly attempt to deflect responsibility for incriminating content located on phones.  To prove that GUERRERO was responsible for the incriminating content, it is necessary to tie him to the phone. Investigators can do this by locating, among other things, messages with identifying information, personal photographs and videos, emails, frequented websites, and GPS data.

32.     It is also probable to believe that manuals, blueprints, and other plans will be located on his electronic devices given the sophisticated nature of GUERRERO's crimes.  As noted in this warrant, the plastic .22 caliber firearm located during the search warrant is rare and plans to make such a firearm using a 3D printer would be complex. Agents are aware of plans for this firearm which were located on the dark web, and it is probable that GUERRERO is in possession of these electronic plans.

33.     Based upon my training and experience and the evidence set forth above, I believe probable cause exists to search the electronically stored information described in Attachment A for evidence of violations of 18 U.S.C. § 922(g)(1) (felon in possession of ammunition), 18 U.S.C. § 922(p) (illegal for person to possess, sell, manufacture, ship, import, a plastic firearm), 18 U.S.C. § 922(a)(1)(a) (engaged in the business without a license), 26 U.S.C. § 5861(b) (Receive/Possess NFA Firearm in violation of law), 26 U.S.C.

14

§ 5861(a) (engage in NFA make/Import/Deal business without a license), and 26 U.S.C.

§ 5861(f) (Make NFA weapon in violation of law).

## TECHNICAL TERMS

34.   Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.   These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.   A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.   In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.   These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.   Digital camera:   A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.   Digital cameras use a variety of fixed and removable storage media to store their recorded images.   Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.   Removable storage media include various types of flash memory cards or miniature hard drives.   Most digital cameras also include a screen for viewing the stored images.   This storage media can contain any digital data, including data unrelated to photographs or videos.

c.   Portable media player:   A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.   However, a portable media player can also store other digital data.   Some portable media players can use removable storage media.   Removable storage media include various types of flash memory cards or miniature hard drives.   This removable storage media can also store any

15

digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. USB Drive: A device for storing digital media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data.

g. MICRO-SD Card: A device for storing various forms of digital media, files, etc.

h. Cell Phone SIM Card: A device that can contain digital media as well as phone numbers linked to a specific card to be inserted into a cell phone in order to activate the wireless telephone

16

i. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

j. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

35. Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

36. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

37. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when.

There is probable cause to believe that this forensic electronic evidence might be on the

Devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

38. *Nature of examination*. Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit the would permit the

examination of Devices A, B, C, D, E consistent with the warrant.

39. *Manner of execution*. Because this warrant seeks only permission to examine

devices already in law enforcement's possession and the electronically stored

information previously extracted from the devices, the execution of this warrant does not

involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

40.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Device A as described in Attachment A to seek the items described in Attachment B.

RYAN ARNOLD  Digitally signed by RYAN ARNOLD
Date: 2021.12.08 13:23:16 -06'00'

**Ryan Arnold**
**Special Agent, ATF**

Sworn and attested to me by reliable electronic means pursuant to the requirement of Fed. R. Crim.P. 4.1 (Telephone) on this _____ day of December, 2021.

**HONORABLE JAMES R. SICKEL**
**United States Magistrate Judge**
**Application No.**

19

## ATTACHMENT A
### Property to Be Searched

A. One (Eleven (11) various in size USB Thumb Drives located near the basement printers listed under ATF case number 772120-22-0011 item 000008

B. Five (5) Micro-SD cards of various size listed under ATF case number 772120-22-0011 item 000009

C. One (1) Verizon, One (1) Cricket, and two (2) Sprint Sim Cards for cell phones listed under ATF Case number 772120-22-0011 item 000010

D. One (1) PNY 16GB Micro-SD card located inside 3d Printer listed under ATF case number 772120-22-0011 item 000011

E. One (1) LG Smartphone model #LM-Q730TM bearing IMEI#354590114484068 listed under ATF case number 772120-22-0011 item 000012

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. § 922(g)(1) (felon in possession of ammunition), 18 U.S.C. § 922(p) (illegal for person to possess, sell, manufacture, ship, import, a plastic firearm), 18 U.S.C. § 922(a)(1)(a) (engaged in the business without a license), 26 U.S.C. § 5861(b) (Receive/Possess NFA Firearm in violation of law), 26 U.S.C. § 5861(a) (engage in NFA make/Import/Deal business without a license), and 26 U.S.C. § 5861(f) (Make NFA weapon in violation of law), involving Mitchell GUERRERO (DOB: 1992) and others, since January 1, 2019, including:

     a.  Text messages, photographs, videos, ledgers, contact lists, and electronic mail;

     b.  The existence, scope, nature, and overt acts in furtherance of the conspiracy and the identity of any co-conspirators;

     c.  lists of firearms traffickers, and related identifying information;

     d.  types, amounts, and prices of firearms transactions, as well as dates, places, and amounts of specific transactions;

     e.  any information related to sources of firearms (including names, addresses, phone numbers, or any other identifying information);

     f.  any and all information related to the manufacture of privately made firearms to include blueprints and photographs

     g.  any information related to sale, purchase, manufacture, receipt, or possession and transportation of firearms;

     h.  any information about firearms, firearm accessories, or ammunition;

     i.  any information about the manufacture of plastic firearms

j. all bank records, checks, credit card bills, account information, and other financial records relevant to the sale, transfer, or disposition of and firearms;

k. The relevant offense conduct, any preparatory steps taken in furtherance of the scheme, communications between the suspect and others related to the relevant offense conduct in the above-listed crimes; and

l. Evidence indicating the device user's state of mind as it relates to the crime under investigation.

m. All photos, videos of individuals possibly possessing firearms, to include all location metadata of the digital media

n. I.P addresses of locations associated with the transportation of firearms

2. Evidence of user attribution showing who used or owned the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.